UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GERALD A. DACOSTA,
    Plaintiff,

v.
                                    CIVIL ACTION NO.
                                    11-12133-MBB

TOWN OF PLYMOUTH,
    Defendant.


**MEMORANDUM AND ORDER RE:**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 33);**
**DEFENDANT'S MOTION TO STRIKE (DOCKET ENTRY # 45)**


**July 1, 2014**

**BOWLER, U.S.M.J.**

    Pending before this court is a motion for summary judgment (Docket Entry # 33) filed by defendant Town of Plymouth ("the Town"). Plaintiff Gerald A. DaCosta ("DaCosta") opposes the motion. (Docket Entry # 40). Also pending is a motion to strike portions of an affidavit of DaCosta and an affidavit of Dale Webber ("Webber") (Docket Entry # 45) which DaCosta opposes (Docket Entry # 51). After conducting a hearing on January 23, 2014, this court took the motions (Docket Entry ## 33 & 45) under advisement.


<u>PROCEDURAL BACKGROUND</u>

The parties' dispute arises out of DaCosta's employment with the Town. The five count verified complaint sets out the following causes of action: (1) violation of DaCosta's right to equal protection under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 ("section 1983") (Count I); (2) breach of contract (Count II); (3) breach of the implied covenant of good faith and fair dealing (Count III); (4) violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e ("Title VII" or "section 2000-e"), and Massachusetts General Laws chapter 151B ("chapter 151B") (Docket Entry # 1, ¶¶ 5, 55, 58) based on disability and national origin discrimination, the Age Discrimination in Employment Act, 29 U.S.C. § 621. ("ADEA" or "section 621") and chapter 151B based on age discrimination (Count IV); and (5) intentional infliction of emotional distress (Count V). (Docket Entry # 1).

Although debatable, this court interprets Count IV as also raising hostile work environment claims. (Docket Entry # 1, ¶¶ 22, 30, 40, 42, 47 & 55); see Gorski v. New Hampshire Dept. of Corrections, 290 F.3d 466, 470 (1st Cir. 2002) (construing amended complaint as raising hostile work environment claim). The complaint sets out a series of events and disparate treatment transpiring over a five year period from 2006 to 2011. In paragraph 40, which paragraph 55 incorporates into Count IV, the complaint alleges that, "all of the events are linked as a

2

continual course of intentional harassment over said period . .
. creating a hostile work environment." (Docket Entry # 1, ¶¶
40, 55). Elsewhere, the complaint refers to "an on going
pattern, based upon his age, medical condition" and "national
origin (Bermudian) in an attempt to get him to quit" thus
"creating a hostile work environment." (Docket Entry # 1, ¶¶
22, 55). The complaint also describes the misconduct as
"harassment, as part of a pattern due to Plaintiff's age,
diabetic condition, and national origin." (Docket Entry # 1, ¶¶
30, 55). Additional language includes "a hostile environment,"
"harass," "a hostile and abusive employment environment,"
"harassment" and "a pattern of behavior." (Docket Entry # 1, ¶¶
37, 42, 47, 51, 55). Count IV therefore sets out not only
discrete employment discrimination claims but also hostile work
environment claims.[1] See id. at 469-470.

The summary judgment motion seeks dismissal of all five
counts. (Docket Entry # 33). In response to the motion,
DaCosta "stipulates to the dismissal of Counts II, III, and V"
of the complaint. (Docket Entry # 40). The motion therefore
reduces to the merits of summary judgment as to the claims in
counts I and IV.

---

[1] The complaint's single reference to the "Americans with
Disabilities Act" in the jurisdictional section of the complaint
without a citation and with no additional reference does not
adequately plead a claim under the Americans with Disabilities
Act 42 U.S.C. §§ 12101-12213 ("ADA").

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corporación De Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007). It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Pierce v. Cotuit Fire District, 741 F.3d 295, 301 (1st Cir. 2014); see also Caban-Rodriguez v. Jimenez-Perez, 2014 WL 959489, at *1 (1st Cir. March 12, 2014) (applying "the same legal standard as the district court" when reviewing summary judgment).

"Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" Green Mountain Realty Corp. v. Leonard, 2014 WL 1613704, at *6 (April 23, 2014). The evidence is viewed "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor. Ahmed v. Johnson, 2014 WL 2111236, at *3 (1st Cir. May 21, 2014). Where, as here, the nonmovant bears the burden of

proof at trial, he "must point to facts memorialized by materials of evidentiary quality and reasonable inferences therefore to forestall the entry of summary judgment." Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014); see Woodward v. Emulex Corp., 714 F.3d 632, 637 (1st Cir. 2013) (as to issues on which nonmovant bears burden of proof, he must "'demonstrate that a trier of fact reasonably could find in his favor'").

In reviewing a summary judgment motion, a court may examine "all of the record materials on file," Geshke v. Crocs, Inc., 740 F.3d at 77, "including depositions, documents, electronically stored information, affidavits or declarations . . . or other material." Fed.R.Civ.P. 56(c)(1). "Unsupported allegations and speculation" however "do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see Serra v. Quantum Servicing, Corp., 747 F.3d 37, 40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded").

The Town submits a statement of undisputed facts under LR. 56.1. (Docket Entry # 35). DaCosta responds to the LR. 56.1 statement and admits a number of the undisputed facts. Uncontroverted statements of fact in a LR. 56.1 statement comprise part of the summary judgment record. See Cochran v.

_Quest Software, Inc._, 328 F.3d 1, 12 (1st Cir. 2003); <u>Stonkus v.</u>
<u>City of Brockton School Department</u>, 322 F.3d 97, 102 (1st Cir.
2003).

In addition, where, as here, a complaint is verified, it is
appropriate to consider factual averments based on personal
knowledge as the equivalent of an affidavit for purposes of
summary judgment. <u>Sheinkopf v. Stone</u>, 927 F.2d 1259, 1262-1263
(1st Cir. 1991). Conclusory allegations, however, "do not pass
muster, and hence, must be disregarded." <u>Id.</u> at 1262.
Likewise, "'an affidavit . . . made upon information and belief
. . . does not comply with Rule 56(e).'" <u>Id.</u> at 1271.

I.  <u>MOTION TO STRIKE</u>

The Town moves to strike DaCosta's (Docket Entry # 40-1)
and Webber's (Docket Entry # 40-3) affidavits. It submits that
the affidavits: (1) are improperly premised on information and
belief; and (2) contain speculative, conclusory or hearsay
statements. The Town additionally maintains that DaCosta's
affidavit contradicts a number of prior sworn statements in his
deposition. Insofar as statements in the verified complaint
mirror statements in DaCosta's affidavit, the Town also seeks to
strike the corresponding statements in the verified complaint
which, as noted above, is the equivalent of an affidavit for
purposes of summary judgment.

A.  <u>Statements Premised on Belief</u>

The Town contends that DaCosta's statements are not based on the "personal knowledge" mandate of Fed.R.Civ.P. 56(c)(4) ("Rule 56(c)(4)") and are therefore hearsay. Under Rule 56(c)(4), "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4); Kenney v. Floyd, 700 F.3d 604, 609 (1st Cir. 2012); Sheinkopf v. Stone, 927 F.2d at 1271 (affidavits based upon "information and belief" do not comply with Rule 56).

Reviewing the challenged statements under this standard, the following statements in DaCosta's affidavit are stricken: (1) the third sentence of the second paragraph in paragraph one; (2) the third sentence of the final paragraph in paragraph one; and (3) the first and second sentences of the second paragraph in paragraph ten.

B.  Conclusory or Hearsay Statements

The Town next argues that DaCosta's affidavit contains legal arguments and conclusory assertions and that Webber's affidavit contains arguments, conclusory assertions and hearsay assertions.[2]  DaCosta submits that the statements in Webber's affidavit are based on his "personal observations as a long time

---

[2]  The Town does not explicitly challenge DaCosta's averments as hearsay.

union official in the Town of Plymouth" and are "based upon his [own] personal knowledge." (Docket Entry # 51). "Unsupported, subjective, conclusory, or imaginative" statements made within a summary judgment affidavit are not part of the summary judgment record. Torrech-Hernandez v. General Elec. Co., 519 F.3d 41, 47 (1st Cir. 2008) (statements that "amount to nothing more than self-serving, factually devoid declarations" are not given any weight). It is also "black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted." Kenney v. Floyd, 700 F.3d at 609 (internal quotations omitted).

The following statements in DaCosta's affidavit constitute legal arguments or conclusory assertions: (1) the entire third paragraph in paragraph one; (2) the fourth sentence of the first paragraph in paragraph two;[3] (3) the first,[4] second and fourth sentences of the final paragraph in paragraph three; (4) the clause in the final sentence of paragraph four that reads, "due to [DaCosta's] medical condition";[5] (5) the third sentence of the final paragraph in paragraph five; (6) the final sentence in paragraph six; (7) the last clause in the last sentence in

---

[3]   The first sentence in paragraph two is stricken except for the fact, based on DaCosta's personal knowledge (Docket Entry # 40-1, p. 1, line 3), that the Town tore up the grievance (Docket Entry # 40-1, ¶ 3(2), sent. 1).

[4]   The first sentence is stricken except for the clause, "The Defendant . . . tearing up the grievance."

[5]   This statement constitutes a legal argument.

paragraph seven;[6] (8) the fifth and sixth sentences of the first
paragraph in paragraph eight;[7] (9) the last sentence of the
second paragraph in paragraph eight; (10) the first clause of
the first sentence and the final sentence of the third paragraph
in paragraph eight; (11) the third, fourth and fifth sentences
in paragraph nine; (12) the statement in the first sentence of
the first paragraph in paragraph ten that reads, "Another
incident of dissimilar and malicious treatment"; (13) the
statement in the second sentence that reads, "since there wasn't
any proof to back the alleged claims made against the
Plaintiff," and the fourth sentence of the third paragraph in
paragraph ten; (14) the final paragraph in paragraph ten except
for the last clause in the final sentence; and (15) the fourth
and fifth sentences of the final paragraph in paragraph 12.

Turning to Webber's affidavit (Docket Entry # 40-3), he
attests that:

> In some instances, the files I possess, the issues that
> were told to me by those filing them (since deceased) and
> the cases they represent show a pattern that any reasonable
> person could conclude that the Plaintiff, (sic) management
> targeted DaCosta by unfairly harassing him regarding work
> assignments and even unfair discipline based upon
> groundless claims.

(Docket Entry # 40-3, ¶ 5).  Although Webber also attests that

---

[6]    The same ruling applies to the last clause in paragraph
11, which is identical to paragraph seven and reads, "again
being older, he was treated differently."

[7]    The sentences are conclusory and argumentative.

the contents of the affidavit are based on "his own personal knowledge," there are no facts to support his involvement as a fact witness in the incidents that DaCosta experienced from 2006 to 2011. See Livick v. The Gillette Co., 524 F.3d 24, 28 (1st Cir. 2008) ("'requisite personal knowledge' needed for a summary judgment affidavit 'must concern facts as opposed to conclusions, assumptions or surmise'"). "[T]he issues that were told to" Webber constitute inadmissible hearsay. See Bhatti v. Trustees of Boston University, 659 F.3d 64, 71 (1st Cir. 2011) (Bhatti's recitation of coworkers' out-of-court statements about scheduling disparities in employment discrimination case is "inadmissible hearsay").

The following statements in Webber's affidavit are based on information or belief or constitute legal argument, conclusory assertions or hearsay: (1) the clause in paragraph two that reads, "the treatment [DaCosta] was subjected to by [the Town] leading to his filing of the complaint"; (2) paragraph three; (3) paragraph four; (4) paragraph five; (5) paragraph six except for the first clause of the first sentence; (6) paragraph seven; and (7) the clause in paragraph eight stating the "pattern of harassing tactics and adverse

employment actions regarding [Town] employees who were subjected to such treatment."[8]  (Docket Entry # 40-3, ¶ 8).

## C.  Statements Contradicting Prior Testimony

The Town next argues that paragraphs one, three, four and ten in DaCosta's affidavit contain statements that contradict his prior deposition testimony.  It is not necessary to strike the challenged portion of paragraphs one, three and four because their inclusion in the record would not alter the result.  As discussed infra, the 2006 and July 2009 incidents are untimely.

The challenged statement in paragraph four does not contradict the identified statements in DaCosta's deposition. The averment in paragraph ten regarding the "harassment" being part of an "ongoing pattern, based upon his age, medical condition," diabetes and national origin directly contradicts the cited deposition testimony and is therefore stricken.  See Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006) (if party's affidavit directly contradicts that party's deposition testimony, the court shall disregard the affidavit unless the party can offer a "satisfactory explanation").

## II.  MOTION FOR SUMMARY JUDGMENT

---

[8]  In the alternative, even if these statements were part of the record, they would not change the decisions regarding summary judgment.

<u>FACTUAL BACKGROUND</u>

On July 14, 2010, DaCosta filed a complaint with the
Massachusetts Commission Against Discrimination ("MCAD") and the
U.S. Equal Employment Opportunity Commission ("EEOC"). (Docket
Entry # 1, ¶ 3) (Docket Entry # 35, ¶ 68) (Docket Entry # 53, ¶
68). On January 31, 2011, he withdrew the charges and filed
this action against the Town. (Docket Entry # 1, ¶ 4) (Docket
Entry # 35, ¶ 69) (Docket Entry # 53, ¶ 69).

DaCosta was born in 1953 in Bermuda and, at all relevant
times, his citizenship was Bermudian. (Docket Entry # 35, ¶ 20)
(Docket Entry # 53, ¶ 20) (Docket Entry # 35-1, pp. 8, 66-67)
(Docket Entry 40-1, ¶ 3(3), sent. 5) (Docket Entry # 1, ¶ 17,
sent. 2). He "is one-half Portuguese and one-half Bermudian."
(Docket Entry # 35, ¶ 20) (Docket Entry # 53, ¶ 20) (Docket
Entry # 35-1, pp. 66-67). He moved to the United States in
1957. (Docket Entry # 35-1, p. 8).

DaCosta began working for the Town in May 2004 as a truck
driver or motor equipment operator. (Docket Entry # 35, ¶ 1)
(Docket Entry # 53, ¶ 1) (Docket Entry # 35-1, p. 31). He is a
member of the American Federation of State, County and Municipal
Employees Union ("the union"). (Docket Entry # 35, ¶ 2) (Docket
Entry # 53, ¶ 2) (Docket Entry # 35-1, p. 31) (Docket Entry #
35-6). Before working for the Town, DaCosta "had never been
diagnosed with a disability." (Docket Entry # 35, ¶ 3) (Docket

12

Entry # 53, ¶ 3) (Docket Entry # 35-1, p. 32). In or around 2005, however, DaCosta was diagnosed with Type 2 diabetes. (Docket Entry # 35, ¶ 4) (Docket Entry # 53, ¶ 4) (Docket Entry # 35-1, pp. 32-33).

On January 19, 2006, the Town's Department of Public Works ("the DPW") posted a job opening for an "HMEO Roll-Off position in-house." (Docket Entry # 35, ¶ 6) (Docket Entry # 53, ¶ 6). The posting for in house employees "closed on January 27, 2006." (Docket Entry # 35, ¶ 6) (Docket Entry # 53, ¶ 6) (Docket Entry # 35-1, pp. 38-39). In 2006, DaCosta had a "Class A license." (Docket Entry # 35, ¶ 5) (Docket Entry # 53, ¶ 5) (Docket Entry # 35-1, p. 39). The position however required a hoisting or hydraulic license. (Docket Entry # 35, ¶ 6) (Docket Entry # 53, ¶ 6) (Docket Entry # 35-1, p. 44). DaCosta applied for the position but "was told that he needed to have a hydraulic license for the job." (Docket Entry # 35, ¶ 7) (Docket Entry # 53, ¶ 7). It is undisputed that he did not have the required license at that time. (Docket Entry # 35, ¶ 7) (Docket Entry # 53, ¶ 7) (Docket Entry # 35-1, p. 44).

From March 1 to 17, 2006, the DPW advertised the job to outside applicants. (Docket Entry # 35-3). Five applicants received interviews. (Docket Entry # 35-3). In April 2006, however, DaCosta told Arthur Duliase ("Duliase"), the Superintendent of the Solid Waste Department, that he had

acquired the license.  (Docket Entry # 1, ¶ 7) (Docket Entry #
35-3).  He also asked Duliase if the position was still open.[9]
(Docket Entry # 1, ¶ 7, sent. 1).  DaCosta "was not told that he
needed to fill out a 'job status report' . . . to obtain the
job."  (Docket Entry # 40-1, ¶ 1(2), sent. 1) (Docket Entry # 1,
¶ 8, sent. 1).  On June 7, 2006, the DPW hired one of the
outside applicants.  (Docket Entry # 35-3).

DaCosta grieved the matter through the union.  (Docket
Entry # 35, ¶ 10) (Docket Entry # 53, ¶ 10).  DaCosta testified
by deposition that the Town should have given him the "chance to
get his hydraulic license rather than hire someone not already
employed by the Town."[10]  (Docket Entry # 35, ¶¶ 9-10) (Docket
Entry # 53, ¶¶ 9-10) (Docket Entry # 35-1, p. 39).  "The
grievance was denied."  (Docket Entry # 35, ¶ 10) (Docket Entry

---

[9]  Duliase died prior to DaCosta's August 2013 deposition.
(Docket Entry # 35-1, p. 43).  DaCosta's recitation of what
Duliase said to him is hearsay because it was not made in good
faith within the meaning of Massachusetts General Laws Chapter
265, section 65.  See Bhatti v. Trustees of Boston University,
659 F.3d at 71 (recitation of coworker's out-of-court statement
is hearsay); Simons v. Hitachi America, Ltd., 2007 WL 1306558,
at *4 (D.Mass. May 3, 2007) (recitation must be made in good
faith).

[10]  DaCosta alleges that the April 2006 incident shows that
the Town applied its "policies and process concerning his
application" differently than it did with respect to other Town
"employees similarly situated."  (Docket Entry # 1, ¶ 9).  When
asked about the basis for the allegations of age discrimination
relative to this incident during his deposition, DaCosta
replied, "Because of that incident; because the person who has
the job now never had all his licenses and he still don't have
all his licenses."  (Docket Entry # 35-1, p. 40).

# 53, ¶ 10) (Docket Entry # 35-3).  At his deposition, DaCosta testified that he was "not really sure" whether age, national origin, and/or disability discrimination was the basis of this incident.[11]  (Docket Entry # 35-1, p. 40).

In November 2006, DaCosta was "working in a cemetery when he urinated by the back wheel of his truck."  (Docket Entry # 35, ¶ 12).  "Teddy" Bubbins ("Bubbins"), the Town's Park Superintendent and DaCosta's supervisor, asked DaCosta what he was doing and DaCosta "told him he was urinating."  (Docket Entry # 35, ¶ 12) (Docket Entry # 53, ¶ 12).  Bubbins became upset and reprimanded DaCosta.  (Docket Entry # 35, ¶¶ 12-13) (Docket Entry # 53, ¶¶ 12-13) (Docket Entry # 35-1, p. 62) (Docket Entry # 40-1, ¶ 3(2), sent. 4) (Docket Entry # 1, ¶ 15,

---

[11]  The relevant testimony at DaCosta's deposition is as follows:
> Q:  Of those three, this particular incident, do you feel it was one or the other of those three that was the basis for your discrimination; what was it?
> A:  I'm not really sure.  It could be age.  I'm not really sure.
> Q:  Why is it that you feel like you were discriminated against as a result of this incident?
> A:  Because the person that they hired knew somebody in the department, he had a girlfriend in the town, working in the town, and I don't know why they would pick him over myself 'cause I'm already working for the town.
> Q:  So you felt that the town should have picked you over somebody else; is that correct?
> A:  Yes.

(Docket Entry # 35-1, pp. 40-41).

sent. 3).  Bubbins also yelled various profanities at DaCosta.[12]
(Docket Entry # 40-1, ¶ 3(2), sent. 1) (Docket Entry # 1, ¶ 14).
DaCosta grieved the incident.  (Docket Entry # 35, ¶ 14) (Docket
Entry # 53, ¶ 14).  The Town tore "up the grievance" (Docket
Entry # 1, ¶ 16, sent. 1) (Docket Entry # 40-1, ¶ 3(2), sent. 1)
and the DPW removed the letter of reprimand from DaCosta's file.
(Docket Entry # 35, ¶ 14) (Docket Entry # 53, ¶ 14) (Docket
Entry # 35-4).  DaCosta cannot identify anyone else who was
caught urinating in public.  (Docket Entry # 35, ¶ 16) (Docket
Entry # 53, ¶ 16) (Docket Entry # 35-1, p. 62).  Bubbins did not
know that DaCosta had a bladder problem at the time.  (Docket
Entry # 35, ¶ 17) (Docket Entry # 53, ¶ 17) (Docket Entry # 35-
1, p. 63).  DaCosta did not provide the Town "with any kind of
diagnosis regarding bladder problems."  (Docket Entry # 35, ¶
17) (Docket Entry # 53, ¶ 17) (Docket Entry # 35-1, pp. 64-65).
DaCosta "never requested a reasonable accommodation from the
town in connection with any bladder problems."[13]  (Docket Entry #
35, ¶ 18) (Docket Entry # 53, ¶ 18) (Docket Entry # 35-1, p.
65).

In January 2007, Selectman Dicky Quintal ("Quintal") "came
into the shop with a new employee and said hello to [DaCosta]."

---

[12]  This statement is not considered for its truth but
rather to show a discriminatory animus, if any.

[13]  DaCosta alleges that the November 2006 incident shows
that the Town treated him differently than younger workers who
are United States citizens.  (Docket Entry # 1, ¶ 17).

(Docket Entry # 35, ¶ 19) (Docket Entry # 53, ¶ 19).  DaCosta
responded, "No speak English" with a Portuguese accent.  (Docket
Entry # 35, ¶ 19) (Docket Entry # 53, ¶ 19).  Quintal is
Portuguese.  (Docket Entry # 35, ¶ 19) (Docket Entry # 53, ¶ 19)
(Docket Entry # 35-1, p. 66).  Quintal complained about the
matter during a televised selectmen's meeting and DaCosta "was
summonsed to Town Hall to speak with Town Manager Melissa
Arrighi about this interaction."  (Docket Entry # 35, ¶ 21)
(Docket Entry # 53, ¶ 21) (Docket Entry # 1, ¶ 29, sent. 2)
(Docket Entry # 35-1, p. 69) (Docket Entry # 40-1, ¶ 12(1),
sent. 5-6).  The Union President and Shop Steward accompanied
DaCosta to the meeting and "both said [DaCosta] had been
joking."  (Docket Entry # 35, ¶ 21) (Docket Entry # 53, ¶ 21).
"That was the end of the matter."  (Docket Entry # 35, ¶ 21)
(Docket Entry # 53, ¶ 21) (Docket Entry # 35-1, pp. 66-67).
Another Town employee, Steve Wood ("Wood"), "also had been
joking with [Quintal] about his shoes and tie" yet "he was not
called into [Melissa Arrighi's] office."  (Docket Entry # 35, ¶
22) (Docket Entry # 53, ¶ 22).  DaCosta acknowledges that
Quintal seemed "to be offended by" DaCosta's joke but not the
jokes by Wood."[14]  (Docket Entry # 35-1, pp. 72-73).

---

[14]  DaCosta alleges that the January 2007 incident shows
that the Town treated him differently than another employee due
to his age, diabetic condition and national origin.  (Docket
Entry # 1, ¶ 30, sent. 4).

In July 2007, "[DaCosta] applied for a Tech 3 position."
(Docket Entry # 35, ¶ 24) (Docket Entry # 53, ¶ 24). "He had
the requisite Class A and hydraulics licenses for the job."
(Docket Entry # 35, ¶ 24) (Docket Entry # 53, ¶ 24). DaCosta
was given the job. (Docket Entry # 35, ¶ 25) (Docket Entry #
53, ¶ 25). He "voluntarily chose not to take the position for
personal reasons." (Docket Entry # 35, ¶ 26) (Docket Entry #
53, ¶ 26). After DaCosta "decided not to take the Tech 3 job,
Tony Lopez got the job and was given the opportunity to get the
required license." (Docket Entry # 35, ¶ 27) (Docket Entry #
53, ¶ 27). DaCosta "did not know of any other instance where
[someone] was given the opportunity to get a license in
connection with their application for a job."[15] (Docket Entry #
35, ¶ 28) (Docket Entry # 53, ¶ 28) (Docket Entry # 35-1, p.
80).

In July 2008, "someone anonymously reported that they saw
[DaCosta] and another employee sleeping in a truck on the job."
(Docket Entry # 35, ¶ 29) (Docket Entry # 53, ¶ 29) (Docket
Entry # 35-1, pp. 82-83). DaCosta was called into the office of
Melissa Arrighi ("Arrighi") and "told about this report."
(Docket Entry # 35, ¶ 30) (Docket Entry # 53, ¶ 30) (Docket
Entry # 35-1, p. 83). "He explained that they were sitting in

---

[15] DaCosta alleges that the July 2007 incident shows that
the Town treated him differently because of his age. (Docket
Entry # 1, ¶ 27).

the truck, waiting for asphalt, and they both had sunglasses on at the time." (Docket Entry # 35, ¶ 30) (Docket Entry # 53, ¶ 30) (Docket Entry # 35-1, p. 83). DaCosta "was never reprimanded for this incident." (Docket Entry # 35, ¶ 30) (Docket Entry # 53, ¶ 30) (Docket Entry # 35-1, pp. 84-85). Arrighi however did not call the other employee, Ricky Holmes ("Holmes"), into her office.[16] (Docket Entry # 35-1, p. 86) (Docket Entry # 1, ¶ 22, sent. 3) (Docket Entry # 40-1, ¶ 10(3), sent. 3).

At a later date, a co-worker "took a picture of [DaCosta]" when he appeared to be sleeping at the library. (Docket Entry # 35-1, p. 87). DaCosta received a one day suspension. (Docket Entry # 35-1, p. 88).

On or about July 3, 2008, DaCosta "provided the town with a doctor's note regarding his diabetes." (Docket Entry # 35, ¶ 33) (Docket Entry # 53, ¶ 33) (Docket Entry # 35-1, pp. 90, 96). The doctor, DaCosta's primary care physician, "told him, that given his diabetes, he needed regular sleep and some kind of regulation to his diet." (Docket Entry # 35, ¶ 33) (Docket Entry # 53, ¶ 33). DaCosta's "physician requested a medical accommodation in [DaCosta's] current position as Motor Equipment

---

[16] DaCosta alleges that the July 2008 incident shows that the Town treated him differently because of his age, diabetic condition and national origin "in an attempt to get him to quit or force him to leave his position with the town, creating a hostile work environment." (Docket Entry # 1, ¶ 22).

Operator." (Docket Entry # 35, ¶ 34) (Docket Entry # 53, ¶ 34) (Docket Entry # 35-2, pp. 96-97).

After receiving the note requesting the accommodation from DaCosta's primary care physician, DaCosta and a union representative met with Ed Buckley ("Buckley"), the highway superintendent, and Roger Hammond ("Hammond"), the DPW director, in a conference room to discuss DaCosta's schedule. (Docket Entry # 35-2, pp. 105-107, 111) (Docket Entry # 1, ¶ 25, sent. 1-2). The union contract dictates that "work should be done for a reasonable amount of time." (Docket Entry # 1, ¶ 24, sent. 1). At his deposition, DaCosta testified that Buckley and Hammond wanted him to take another position in the solid waste division. (Docket Entry # 35-2, pp. 107-108) (Docket Entry # 35-5).

By letter dated July 15, 2008, a Town benefits administrator denied the request for an accommodation regarding DaCosta's "position as Motor Equipment Operator." (Docket Entry # 35-5). The letter explained that the request was not reasonable because the position required "flexibility of hours" and overtime. (Docket Entry # 35-5). In the winter months, the position involved plowing snow and, at times, plowing all night in the event of a winter storm. (Docket Entry # 35-1, pp. 35-36, 90-91) (Docket Entry # 35-2, p. 97) (Docket Entry # 1, ¶ 24, sent. 2) (Docket Entry # 40-1, ¶ 6, sent. 3). DaCosta's work

hours "[i]n the [w]inter of 2008/2009" were "erratic due to snow plowing and" road sanding. (Docket Entry # 1, ¶ 23, sent. 3). He was nevertheless "able to work the reasonable amounts of overtime he was given throughout 2008 and 2009." (Docket Entry # 35, ¶ 40) (Docket Entry # 53, ¶ 40) (Docket Entry # 35-2).

Although the letter denied the requested medical accommodation for DaCosta's current position, the letter recommended "per our discussion of July 11, 2008," that DaCosta "accept the position of Transfer Station Operator within the Solid Waste Division." (Docket Entry # 35-5). The letter states that the Town offered DaCosta the position "as a means of more reasonably accommodating [his] present physical limitations." (Docket Entry # 35-5). The letter also notes that, if DaCosta did not accept the position, a "further discussion will be required by all parties regarding the status of [DaCosta's] position." (Docket Entry # 35-5).

DaCosta "did not want to accept the position of Transfer Station Operator." (Docket Entry # 35, ¶ 36) (Docket Entry # 53, ¶ 36) (Docket Entry # 35-2, p. 97). By letter dated July 17, 2008, he informed the Town that, "he wanted to remain in his current position as [an] asphalt truck driver," was "not interested in being transferred to any positions in other [DPW] departments" and was "willing to work a reasonable amount of

overtime." (Docket Entry # 35, ¶ 37) (Docket Entry # 53, ¶ 37) (Docket Entry # 35-6).

Buckley and Hammond each received a copy of the letter. (Docket Entry # 35-5). DaCosta points to the July 15, 2008 letter as evidence that Buckley and Hammond wanted to get DaCosta "out of the Highway Department due to his diabetes" and wanted him to go "to the Solid Waste Division." (Docket Entry # 35, ¶ 44) (Docket Entry # 53, ¶ 44) (Docket Entry # 35-2, pp. 105-106).

By letter dated July 28, 2008, the Town asked DaCosta's physician to clarify the "medical basis for [his] determination that" DaCosta could not work nights or early mornings and "the nature of the medical condition that" prevented DaCosta "from working with snow and ice." (Docket Entry # 35-7). In a brief note dated August 15, 2008, the physician responded that DaCosta "can work to the best of his ability. [DaCosta] can work ice and snow and a reasonable amount of overtime." (Docket Entry # 35-8). After receiving this note, DaCosta, a union representative, Buckley and Hammond had a meeting. (Docket Entry # 40-1, ¶ 5(2), sent. 1-2). Arguing on behalf of DaCosta, the union representative explained that the hours in the current position were excessive and not necessary according to the union's contract. (Docket Entry # 40-1, ¶ 5(2), sent. 4) (Docket Entry # 1, ¶ 25, sent. 4).

DaCosta remained in his position after August 2008 without requesting or needing "any kind of further accommodation for [his] diabetes." (Docket Entry # 35, ¶ 41) (Docket Entry # 53, ¶ 41) (Docket Entry # 35-2, p. 101). "[F]rom the date of the August 15, 2008 note to the present," DaCosta did not have any issues with working overtime because of his diabetes. (Docket Entry # 35-2, p. 102) (Docket Entry # 35, ¶ 42) (Docket Entry # 53, ¶ 42). DaCosta maintains that "he could do his job even though he had diabetes." (Docket Entry # 35, ¶ 43) (Docket Entry # 53, ¶ 43) (Docket Entry # 35-2, p. 103). At his deposition, DaCosta testified that after his physician sent the August 15, 2008 note, "the issue" was resolved and he was able to work overtime and comply with the schedule for the position. (Docket Entry # 35-2, p. 101). DaCosta also acknowledged that there is no evidence that anyone from the Town tried to "get him to leave his job because of his diabetes" after August 15, 2008. (Docket Entry # 35, ¶ 46) (Docket Entry # 53, ¶ 46) (Docket Entry # 35-2, pp. 112-113).

In July 2009, DaCosta tried working on "the rubbish truck for ten days to see if he liked it." (Docket Entry # 35, ¶ 47) (Docket Entry # 53, ¶ 47) (Docket Entry # 35-2, pp. 89, 117) (Docket Entry # 1, ¶ 18, sent. 1-3) (Docket Entry # 40-1, ¶ 4, sent. 1-2). Instead of trucking asphalt and gravel in his current position, DaCosta hauled garbage for a ten day period.

(Docket Entry # 35-2, p. 117) (Docket Entry # 1, ¶ 18, sent. 1-
3).  The schedule for DaCosta's existing truck driver position
was 7:00 a.m. to 3:30 p.m. whereas the schedule for the garbage
truck position was 4:30 a.m. to 1:00 p.m.  (Docket Entry # 35-2,
pp. 117-118).  He "found that the schedule" for the latter
position "did not work in terms of his diabetes" because of the
earlier start time and "his sleeping and eating patterns."
(Docket Entry # 35, ¶ 48) (Docket Entry # 53, ¶ 48) (Docket
Entry # 1, ¶ 18, sent. 3) (Docket Entry # 40-1, ¶ 4, sent. 3).
He therefore "decided he did not want to take the job."  (Docket
Entry # 35, ¶ 48) (Docket Entry # 53, ¶ 48) (Docket Entry # 35-
2, pp. 117-119).  When DaCosta informed Buckley that he did not
want the garbage truck position, "Buckley gave him a 'hard' time
about not taking the position but [DaCosta] acknowledges that
Buckley never said anything about it in terms of diabetes."
(Docket Entry # 35, ¶ 49) (Docket Entry # 53, ¶ 49) (Docket
Entry # 35-2, pp. 119-122).

As highway superintendent, Buckley makes the final
decisions of assigning jobs within a position such as doing an
asphalt job involving the heavy work of a wheeler or doing a job
"driving to the grader, which" does not involve any labor.
(Docket Entry # 35-2, pp. 125-126, 130) (Docket Entry # 35-11,
pp. 47-48).  Buckley assigned employees "with less seniority"
than DaCosta "to better job assignments."  (Docket Entry # 35, ¶

50) (Docket Entry # 53, ¶ 50) (Docket Entry # 35-2, pp. 124-127). DaCosta testified that this happened "[a]lmost from day one." (Docket Entry # 35-2, pp. 125-126). He also stated that he was "one of the oldest guys" on the crew as well as "the oldest guy doing the hardest work." (Docket Entry # 35-2, pp. 125-127). DaCosta further attributed his assignment to less desirable jobs as favoritism on the part of Buckley.[17] (Docket Entry # 35-2, pp. 125-127).

In the fall of 2009, DaCosta "was not paid for out-of-grade work." (Docket Entry # 35, ¶ 51) (Docket Entry # 53, ¶ 51) (Docket Entry # 35-2, pp. 130-131) (Docket Entry # 40-1, ¶ 8(1), sent. 2). Out of grade pay occurs when an employee works "other types of jobs" in his position and gets paid the rate of pay applicable to the assigned job or work. (Docket Entry # 39) (Docket Entry # 40-1, ¶ 8, sent. 1) (Docket Entry # 35-2, pp. 130-131). He is "unsure of the dates of, and has no documentation regarding, these other alleged occasions."[18] (Docket Entry # 35, ¶ 53) (Docket Entry # 53, ¶ 53) (Docket Entry # 35-2, pp. 137-138). He also "did not grieve these other occasions" or "put anything in writing to the Town." (Docket

---

[17] Title VII does not prescribe favoritism unlawful. See Barry v. Moran, 661 F.3d 696, 708 (1st Cir. 2011) (recognizing that "an employment decision motivated by cronyism, not discrimination, 'would be lawful, though perhaps unsavory'").

[18] DaCosta alleges that the out of grade pay incidents show that the Town treated him differently than "other similarly situated employees." (Docket Entry # 1, ¶ 34, sent. 4).

Entry # 35, ¶ 53) (Docket Entry # 53, ¶ 53) (Docket Entry # 35-2, pp. 136-138).

In 2010, DaCosta filed a grievance regarding a lack of pay for work commensurate with a higher classification for two days in February 2010. (Docket Entry # 35, ¶ 51) (Docket Entry # 53, ¶ 51) (Docket Entry # 35-9). DaCosta alleged in the grievance "that he was not compensated at a higher rate of pay on two occasions, February 19, 2010 and February 22, 2010, when he was assigned to work on the Highway Division asphalt repair crew." (Docket Entry # 35-9). DaCosta's "normal rate of pay is that of an OM1" whereas on the dates in question he was assigned a job to place and finish "hot mix asphalt pavement" which "requires a level of skill equivalent to a classification of OM2." (Docket Entry # 35-9). The "differential in pay would have been $0.34 per hour (or $2.72 for an eight hour work shift)." (Docket Entry # 35-9). The union contract stipulates that, "'A person who works in a higher classification in the bargaining unit shall be paid at the rate of pay in the higher classification for the hours worked.'" (Docket Entry # 35-9). In March 2010, the Town upheld the grievance, determined that DaCosta "should have been assigned out-of-grade pay on the two dates in question" and included the out of grade pay "in his upcoming paycheck." (Docket Entry # 35, ¶ 52) (Docket Entry # 53, ¶ 52) (Docket Entry # 35-9).

Buckley also approved out of grade pay for Dan Finely ("Finely"), a foreman, and Pat Healey ("Healey") when they hauled snow out of town. (Docket Entry # 40-1, ¶ 8(2), sent. 1, 3-4) (Docket Entry # 1, ¶ 32, sent. 1, 3-4) (Docket Entry # 35-11, pp. 49-50) (Docket Entry # 35-2, p. 163). With respect to DaCosta, however, Buckley said he had to speak with the new DPW Director, Hector Castro ("Castro").[19] (Docket Entry # 40-1, ¶ 8(2), sent. 6) (Docket Entry # 1, ¶ 32, sent. 6) (Docket Entry # 35-11, pp. 49-50).

In February 2010, DaCosta learned that "a co-worker," Tim Balboni ("Balboni"), "was asking about [DaCosta] working for the Highway Department [when] he wasn't a U.S. citizen." (Docket Entry # 35, ¶ 54) (Docket Entry # 53, ¶ 54) (Docket Entry # 35-2, p. 144). "Balboni never said anything directly to [DaCosta] in this respect."[20] (Docket Entry # 35, ¶ 54) (Docket Entry #

---

[19] DaCosta's recitation of Buckley's statement is not considered to prove the truth of the matter asserted, i.e., that Buckley had to speak to the DPW Director to obtain out of grade pay. Rather, it is considered to show a discriminatory animus or a dissimilar treatment and the Town's tolerance of that treatment in the workplace. See Tuli v. Brigham & Women's Hospital, 656 F.3d 33, 41 (1st Cir. 2011).

[20] The Town seeks to exclude the statement as hearsay. (Docket Entry # 34, p. 14). In fact, what DaCosta learned "through the grapevine" (Docket Entry # 35, ¶ 54) (Docket Entry # 53, ¶ 54) from other Town employees about what Balboni said to them is not only hearsay but double hearsay. See Bennett v. Saint-Gobain Corp., 507 F.3d 23, 29 (1st Cir. 2007) (unsworn grievances referencing discriminatory remarks made by plaintiff's boss to another employee was hearsay within hearsay); Dávila v. Corporación De Puerto Rico Para La Difusión

53, ¶ 54) (Docket Entry # 35-2, p. 144). Balboni did not

prevent DaCosta "from working on a particular job and DaCosta"

did not report "Balboni's purported comments to the Town."

(Docket Entry # 35, ¶ 55) (Docket Entry # 53, ¶ 55) (Docket

Entry # 35-2, pp. 144-145).

On March 17, 2010, DaCosta had an argument with Balboni

after DaCosta called him "'the biggest crybaby that the town

ever had for a truck driver.'" (Docket Entry # 35, ¶ 62)

(Docket Entry # 53, ¶ 62) (Docket Entry # 35-2, pp. 156-157).

The incident arose in the context of Balboni "saying that

DaCosta disobeyed an order to drive" a particular truck.[21]

(Docket Entry # 1, ¶ 36, sent. 1) (Docket Entry # 40-1, ¶ 2(2),

---

Pública, 498 F.3d at 17 (statement that others told him
supervisor considered him too old for job was hearsay). The
statement reflects that DaCosta heard from an unidentified
employee that Balboni, in turn, was asking why DaCosta was
working for the Highway Department when he was not a U.S.
citizen. Statements in a plaintiff's affidavit "about what he
was told" are properly disregarded as inadmissible hearsay and
cannot be considered on summary judgment for the truth of the
matter asserted. Hannon v. Beard, 645 F.3d 45, 49 (1st Cir.
2011). DaCosta had no firsthand knowledge of Balboni's remarks.
Moreover, he did not provide an affidavit from an employee who
actually heard Balboni's citizenship comments. See Bennett v.
Saint-Gobain Corp., 507 F.3d at 29 ("plaintiff did not offer an
affidavit from any person who actually had heard the alleged
statement" by his boss). As hearsay within hearsay, Balboni's
queries as to why DaCosta was working at the DPW are excluded
from the summary judgment record. See Bhatti v. Trustees of
Boston University, 659 F.3d at 71 ("Bhatti's tenuous mentions of
her coworkers' out-of-court statements, including "out-of-court
statements that she 'learned'" of the disparity, "all constitute
inadmissible hearsay").
    [21] This statement is not considered for the truth of the
matter asserted, i.e., that DaCosta disobeyed the order.

sent. 1).  Balboni responded, "'Old man, I should come down to [DaCosta's address] and beat your f****** a**.'"  (Docket Entry # 35, ¶ 62) (Docket Entry # 53, ¶ 62).  Arrighi "was not aware of this incident between Balboni and [DaCosta]."  (Docket Entry # 35, ¶ 64) (Docket Entry # 53, ¶ 64) (Docket Entry # 35-11, p. 51).  DaCosta "alleges that Balboni was involved in arguments with two other people that same month and others before that time."  (Docket Entry # 35, ¶ 63) (Docket Entry # 53, ¶ 63) (Docket Entry # 35-2, pp. 163-164).

By letter dated March 21, 2010, a town resident wrote to Buckley about observing a DPW truck on March 19, 2010, with a tailgate halfway down and asphalt spilling onto the road. (Docket Entry # 35-10).  DaCosta "had been assigned to cold asphalt" on March 19, 2010.  (Docket Entry # 35, ¶ 57) (Docket Entry # 53, ¶ 57) (Docket Entry # 35-2, pp. 145-146).  Buckley spoke to DaCosta about the resident's complaint.  (Docket Entry # 35, ¶ 59) (Docket Entry # 53, ¶ 59) (Docket Entry # 35-2, pp. 148-150).  DaCosta "did not receive a reprimand or discipline in connection with the resident's complaint."  (Docket Entry # 35, ¶ 59) (Docket Entry # 53, ¶ 59) (Docket Entry # 35-2, pp. 148-150).

DaCosta testified that the incident is discriminatory because Buckley is "always 'picking' on him and that Buckley gets complaints about others but he does not speak with them."

(Docket Entry # 35, ¶ 60) (Docket Entry # 53, ¶ 60) (Docket Entry # 35-2, p. 152).  DaCosta could not "identify incidents in which Buckley received a written complaint about an employee and did not speak with them about it."  (Docket Entry # 35, ¶ 61) (Docket Entry # 53, ¶ 61) (Docket Entry # 35-2, p. 155).

In October 2011, DaCosta "applied for the position of heavy equipment operator" and "interviewed with Buckley and another individual."  (Docket Entry # 35, ¶ 65) (Docket Entry # 53, ¶ 65) (Docket Entry # 35-2, p. 166).  The heavy equipment operator position required "a mower's license" and a "catch basin license," which DaCosta acquired.  (Docket Entry # 35-1, pp. 19-22) (Docket Entry # 35-2, pp. 166-167).  He was offered the job and accepted it.  He began working in the new position in 2011.  (Docket Entry # 35, ¶ 65) (Docket Entry # 53, ¶ 65) (Docket Entry # 35-2, pp. 166-167).

At his deposition, DaCosta testified that he applied "for a foreman's job and did not get it."  (Docket Entry # 35, ¶ 66) (Docket Entry # 53, ¶ 66) (Docket Entry # 35-2, pp. 168-169).  He "went to arbitration on [the] foreman's job" and it was denied.  (Docket Entry # 35, ¶ 66) (Docket Entry # 53, ¶ 66) (Docket Entry # 35-2, pp. 168-170).  Arrighi is unaware of any pattern of singling out DaCosta or treating him differently than other Town employees.  (Docket Entry # 35-11, pp. 55-56).

<u>DISCUSSION</u>

A. Equal Protection (Count I)

The Town argues that Count I is subject to summary judgment because DaCosta does not claim membership in particular suspect class. The Town submits that the claim is therefore improper because the "class-of-one theory" of equal protection that DaCosta invokes "does not apply in the context of public employment." (Docket Entry # 34).

DaCosta maintains that "his treatment was different than that afforded to other employees similarly situated." (Docket Entry # 40, p. 10) (Docket Entry # 1, ¶ 39). He also contends that "standard personnel policies" of the Town "were not applied to him equitably, as they were routinely applied to other employees." (Docket Entry # 40, p. 10) (Docket Entry # 1, ¶ 39).

DaCosta premises the equal protection argument on the fact that other employees received more favorable treatment. For example, he points out that the Town offered Tony Lopez ("Lopez") the Tech 3 position even though he did not have the required license at the time. The Town also did not require Wood to go to Arrighi's office for joking with Quintal. He further alleges that the Town created "a hostile work environment by applying town policies and the union contract to him differently than to other rank and file members" in violation of "his 14th Amendment rights to be  treated equally."

(Docket Entry # 40).

A class of one claim under the Equal Protection Clause "is cognizable when—and only when—a 'plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Cordi-Allen v. Conlon, 494 F.3d 245, 250 (1st Cir. 2007). Here, DaCosta's arguments do not refer to a suspect class and rely upon various incidents in which he received different treatment than other Town employees. Whereas Count IV raises disparate treatment claims of discrimination, Count I asserts that the Town did not afford DaCosta the same equal rights as other similarly situated employees. Accordingly, he raises a class of one equal protection claim.

Notably, "the class-of-one theory of equal protection does not apply in the public employment context." Engquist v. Oregon Department of Agriculture, 553 U.S. 591, 598 (2008); see Farris v. Poore, 841 F.Supp.2d 436, 442 (D.Me. 2012) (dismissing equal protection claim by former town employee because Engquist, 553 U.S. at 598, "is fatal to Farris's claim"). All of the cases DaCosta cites to support the equal protection claim (Docket Entry # 40, pp. 14-18), predate the Supreme Court's 2008 Engquist decision. Engquist "squarely held that 'the class-of-one theory of equal protection does not apply in the public employment context." McGunigle v. City of Quincy, 944 F.Supp.2d

113, 120 (D.Mass. 2013); Engquist, 553 U.S. at 598.  Count I,
premised on an equal protection claim in the context of
DaCosta's public employment with the Town, is therefore subject
to summary judgment.

B.  Discrimination (Count IV)

    1.  Administrative Exhaustion

The Town contends that Count IV is subject to summary
judgment with respect to the incidents that took place more than
300 days before DaCosta filed the administrative charge with the
MCAD.  The Town maintains that DaCosta failed to exhaust his
administrative remedies within the prescribed time limits for
these discrete incidents.  (Docket Entry # 34).  DaCosta submits
that the claims are not time barred due to the "linkage of the
events over an extended period of time."  (Docket Entry # 40, p.
9).  The Town additionally argues that DaCosta fails to state a
claim of discrimination due to the absence of an adverse
employment action based on DaCosta's national origin, disability
and age.  (Docket Entry ## 34 & 44).

"Title VII requires exhaustion of administrative remedies
as a condition precedent to suit in federal district court."
Jensen v. Frank, 912 F.2d 517, 520 (1st Cir. 1990); accord
Noviello v. City of Boston, 398 F.3d 76, 85 (1st Cir. 2005)
("[t]o prosecute a harassment claim under either Massachusetts
or federal law, an aggrieved party must first file a timely

33

administrative complaint"); accord Aly v. Mohegan Council, Boy
Scouts of America, 711 F.3d 34, 41 (1st Cir. 2013) (failure to
exhaust Title VII "administrative process 'bars the courthouse
door'").  Under section 2000e-5(e), the individual has 180 days
after the unlawful employment practice to file a claim with the
EEOC.  Section 2000e-5(e) extends this period to 300 days after
the unlawful employment practice when the individual files first
with an authorized state or local agency.  42 U.S.C. § 2000e-
5(e)(1); see Rivera-Diaz v. Humana Insurance of Puerto Rico,
Inc., 2014 WL 1395064, at *2 (1st Cir. April 11, 2014).  The
longer period of 300 days is therefore "available only in so-
called 'deferral' jurisdictions, in which 'a State or local
agency has authority to grant or seek relief from' the allegedly
illegal practice."  Rivera-Diaz v. Humana Insurance of Puerto
Rico, Inc., 2014 WL 1395064, at *2.  Massachusetts is a deferral
state which affords a plaintiff 300 days to file the
administrative charge.  Mass. Gen. Laws ch. 151B, § 5; see
Noviello v. City of Boston, 398 F.3d at 85 (summarizing Sabree
v. United Brotherhood of Carpenters & Joiners, 921 F.2d 396, 399
& n.5 (1st Cir. 1990), in parenthetical that Massachusetts is a
deferral state).  In short, both Title VII and chapter 151B
"require that a charge be filed within 300 days of the alleged
unlawful employment practice."  Tuli v. Brigham & Women's
Hospital, 656 F.3d at 40 (citing 42 U.S.C. § 2000e-

5(e)(1)(2006), and Mass. Gen. Laws ch. 151B, § 5 (2011)).  The

ADEA also extends the time period to 300 days where, as here,

the "claims are considered by a state or local agency in

addition to the EEOC."  Santiago v. Abbott Pharmaceutical PR

Ltd., 2008 WL 3895596, at *6 (D.P.R. Aug. 19, 2008); American

Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 122 (1st Cir.

1998) ("[i]n 'deferral states' . . . employees must file charges

of unlawful age discrimination in employment with the EEOC

within 300 days 'after the alleged unlawful practice

occurred'"); 29 U.S.C. § 626(d).

DaCosta filed the administrative charge with the MCAD and

the EEOC on July 14, 2010.  (Docket Entry # 1, ¶ 3).  Subject to

limited exceptions, incidents that took place prior to September

17, 2009, are untimely.  Relying on Nat'l R.R. Passenger Corp.

v. Morgan, 536 U.S. 101 (2002), DaCosta submits that the causes

of actions are not time barred because they constitute hostile

work environment claims.  (Docket Entry # 40).  In the

supporting memorandum, the Town does not address the hostile

work environment claims.[22]  (Docket Entry # 34).  The timeliness

---

[22]  The Town's reply brief takes the mistaken position that
the complaint does not include a hostile work environment claim.
The Town then states that, "[i]n any event," such a claim fails
for the sole reason that the Webber affidavit is not based on
personal knowledge and should be stricken.  (Docket Entry # 44,
pp. 2-3).  Even if true, the affidavit is not the only evidence
in the record.  The Town's failure to discuss or address the
merits of the hostile work environment claims or provide any

(or the merits) of the hostile work environment claims is
therefore not at issue.[23]  Rather, it is the timeliness of the
remaining age, disability and national origin discrimination
claims in Count IV that remain at issue.  The Town maintains
that the continuing violation doctrine does not apply to these
claims.

Under Title VII and the ADEA, the continuing violation
doctrine "allows an employee to seek damages for otherwise time-
barred allegations if they are deemed part of an ongoing series
of discriminatory acts and 'there is some *violation* within the
statute of limitations period that anchors the earlier claims.'"
Loubriel v. Fondo del Seguro del Estado, 694 F.3d 139, 144 (1st
Cir. 2012) (emphasis added) (quoting O'Rourke v. City of

---

other basis to dismiss these claims results in their remaining
in this action at this point in time.
[23]  "Hostile environment claims are different in kind from
discrete acts." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S.
at 115.  A hostile work environment "'is composed of a series of
separate acts that collectively constitute one "unlawful
employment practice."'"  Tobin v. Liberty Mutual Insurance Co.,
553 F.3d 121, 130 (1st Cir. 2009) (quoting Nat'l R.R. Passenger
Corp. v. Morgan, 536 U.S. at 117).  Such claims involve repeated
acts in which each "single act of harassment may not be
actionable on its own." Johnson v. University of Puerto Rico,
714 F.3d 48, 53 (1st Cir. 2013). Consequently, as "long as all
acts which constitute the claim are part of the same unlawful
employment practice and at least one act falls within the [300
day] time period," the charge is timely filed absent equitable
doctrines or defenses such as laches.  Nat'l R.R. Passenger
Corp. v. Morgan, 536 U.S. at 122; see Tuli v. Brigham & Women's
Hospital, 656 F.3d at 40-41; Marrero v. Goya of Puerto Rico,
Inc., 304 F.3d 7, 18 (1st Cir. 2002).

Providence, 235 F.3d 713, 730 (1st Cir. 2001), a case involving continuing violation doctrine as applied to 300 day pre-suit, Title VII limitations period); Cordero-Suarez v. Rodriguez, 689 F.3d 77, 83 (1st Cir. 2012) (although "doctrine can render otherwise time-barred conduct actionable, the doctrine still requires some anchoring violation within the limitations period"); Campbell v. BankBoston, N.A., 327 F.3d 1, 11 (1st Cir. 2003) (affirming allowance of summary judgment of ADEA claim because "only act about which Campbell complains which is within the time limitations period is . . . not independently discriminatory"); see Lawton v. State Mut. Life Assurance Co. of America, 101 F.3d 218, 222 (1st Cir. 1996) ("[c]ommon sense teaches that a plaintiff cannot resuscitate time-barred acts, said to be discriminatory, by the simple expedient of linking them to a non-identical, non-discriminatory, non-time barred act"); accord Lockridge v. The University Of Maine System, 597 F.3d 464, 474 (1st Cir. 2010) (quoting Lawton, 101 F.3d at 222, in parenthetical); Goldman v. Sears, Roebuck & Co., 607 F.2d 1014, 1018 (1st Cir. 1979) (courts hold that if "ADEA violation is of a continuing nature, the charge of discrimination filed with the appropriate agency may be timely as to all discriminatory acts encompassed by the violation").

In addition to requiring an anchoring violation within the 300 day period, under Title VII the "discriminatory act must

'substantially relate to the earlier incidents of abuse.'"
Lockridge v. The University of Maine System, 597 F.3d at 474
(internal brackets omitted) (citing Sabree v. United Brothers of
Carpenters and Joiners Local No. 33, 921 F.2d at 401-402); see
Sabree v. United Brothers of Carpenters and Joiners Local No.
33, 921 F.2d at 401-402 (plaintiff can recover damages for acts
outside limitations period if there is "substantial relationship
between the timely and the untimely claims").  The same
principle applies to the ADEA.  See Rivera-Rodríguez v. Frito
Lay Snacks Caribbean, a Div. of Pepsico Puerto Rico, Inc., 265
F.3d 15, 22 (1st Cir. 2001).  An anchoring act is substantially
related to an untimely act when the subject matter is
"'sufficiently similar.'"[24]  Lockridge v. The University of Maine
System, 597 F.3d at 474 n.7 (citing O'Rourke v. City of
Providence, 235 F.3d at 731).

    Finally, the continuing violation "doctrine does not apply

_____

    [24]  A plaintiff must also show that the "earlier violations
outside of the six-month limitations period did not trigger the
plaintiff's 'awareness and duty' to assert his rights."  Dean v.
Champion Exposition Services, Inc., 2013 WL 1992234, at *4
(D.Mass. May 10, 2013) (internal brackets omitted); accord
Windross v. Barton Protective Services, Inc., 586 F.3d 98, 103
(1st Cir. 2009); see also Cuddyer v. Stop and Shop Supermarket
Co., 750 N.E.2d 928, 938 (Mass. 2001) (setting out a
corresponding requirement for chapter 151B discrimination claim
that was not hostile work environment claim).  This court's
resolution of the motion makes it unnecessary to address this
aspect of the continuing violation doctrine under the Title VII
claims, the ADEA as well as the chapter 151B age and national
origin claims.

to 'discrete acts' of alleged discrimination that occur on a 'particular day.'" Tobin v. Liberty Mutual Insurance Co., 553 F.3d at 130 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 115). Rather, the doctrine only applies "to discriminatory conduct that takes place 'over a series of days or perhaps years.'" Id. (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 115). Discrete acts often include promotions, terminations, transfers and refusals to hire. Id. at 129. Other examples include not giving an employee a position for which he did not apply. See Johnson v. University of Puerto Rico, 714 F.3d at 53. A discrete and untimely act is not actionable even if it relates to acts that are timely filed. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 113.

Massachusetts law also adheres to the continuing violation doctrine as an exception to the limitations periods in chapter 151B. Noviello v. City of Boston, 398 F.3d at 86; see 804 C.M.R. § 1.10(2). As recently explained by the Massachusetts Supreme Judicial Court ("SJC"), "in certain discrimination cases" under chapter 151B "the continuing violation doctrine permits plaintiffs to recover for damages occurring outside the limitations period as long as 'there is a discrete violation within the statute of limitations period to anchor the earlier claims.'"[25] Crocker v. Townsend Oil Co., Inc., 979

N.E.2d 1077, 1084-1085 (Mass. 2012) (quoting Cuddyer, 750 N.E.2d

at 936-937); Pelletier v. Town of Somerset, 939 N.E.2d 717, 731

(Mass. 2010) (doctrine allows "damages for alleged

discrimination occurring outside" limitations period if "there

is a discrete violation within the statute of limitations period

to anchor the earlier claims"); Windross v. Barton Protective

Services, Inc., 586 F.3d at 103 ("plaintiff must prove that . .

. at least one discriminatory act occurred within the

limitations period"); 804 C.M.R. § 1.10(2).  Moreover, the

anchoring "discriminatory acts" or act must have "a substantial

relationship to the alleged untimely discriminatory acts."

Ocean Spray Cranberries, Inc. v. Massachusetts Com'n Against

Discrimination, 808 N.E.2d 257, 266 (Mass. 2004); Windross v.

Barton Protective Services, Inc., 586 F.3d at 103; see also

Noviello v. City of Boston, 398 F.3d at 86.

"[T]he nature of the unlawful conduct" determines the

applicability of the continuing violation doctrine in a chapter

151B claim.  See Clifton v. Massachusetts Bay Transp. Authority,

839 N.E.2d 314, 318-319 & n.6 (Mass. 2005).  Failures to provide

a reasonable accommodation to a disabled employee may provide a

basis to apply the doctrine.  See id. at 318-319 (citing cases

that invoke continuing violation doctrine for discrimination

---

[25]   These principles do not apply to the hostile environment
claims because the Town makes only a brevis and unrelated
argument regarding those claims.  See fn. 22 & 23.

based on sexual harassment, disability, gender and retaliation);
Windross v. Village Automotive Group, Inc., 887 N.E.2d 303, 306
(Mass.App.Ct. 2008); Valls v. Geon Engineered Films, Inc., 2004
WL 1427160, at *3 (Mass.Super. April 20, 2004) (applying
continuing violation doctrine in chapter 151B age discrimination
case and finding claim untimely).

A chronological time line of the events helps frame the
analysis.  Chronologically listed, the primary events consist of
the following:  (1) the 2006 refusal to hire DaCosta for the
roll off position because he lacked a required license; (2) the
November 2006 cemetery incident when Bubbins verbally and
physically abused DaCosta for urinating in the cemetery,
notwithstanding DaCosta's bladder problems, and the Town
destroyed DaCosta's grievance purportedly to protect Bubbins;
(3) the January 2007 joke incident with Quintal which resulted
in Arrighi summoning DaCosta to her office but not summoning
Wood, who also made jokes to Quintal; (4) the July 2007 awarding
of the Tech 3 job, which DaCosta declined, to Lopez who, in
contrast to DaCosta's 2006 experience, had the opportunity to
obtain the required license; (5) the July 2008 incident during
which Arrighi called DaCosta, but not Holmes, into her office
because of a report that he and Holmes were sleeping in a truck;
(6) the July 2008 doctor's note regarding DaCosta's diabetes and
the request for a medical accommodation for his schedule; (7)

the July 2008 refusal by DaCosta to transfer to a position in
the solid waste division; (8) the July 2009 decision by DaCosta
not to accept a garbage truck position because the schedule was
more detrimental to his diabetes than his current position as a
motor equipment operator; (9) Buckley's denial of out of grade
pay to DaCosta in the fall of 2009 and the delay in receiving an
award of out of grade pay for the two days in February 2010;[26]
(10) Buckley's March 2010 conversation with DaCosta regarding
the complaint from the town resident about observing the truck
DaCosta was driving; (11) DaCosta's March 17, 2010 argument with
Balboni and Balboni's old man statement; and (12) Buckley's
assignments of better jobs to employees with less seniority than
DaCosta between 2004 and 2010.  Items nine through 12 set out
timely events and are addressed on the merits in the next
section.  DaCosta relies on the continuing violation doctrine
and hostile work environment claims as a means to capture and
obtain damages for the untimely acts.

Addressing the chapter 151B disability claim,[27] the Town
denied the requested medical accommodation by letter dated July

---

[26]    DaCosta also points out that Buckley awarded out of
grade pay to Finley and Healey.

[27]    Title VII does not encompass disability discrimination.
Harris v. Potter's House Family and Children Treatment Center,
2013 WL 5436775, at *1 (N.D.Ga. Sept. 27, 2013); Clifton v.
Georgia Merit System, 478 F.Supp.2d 1356, 1361 (N.D.Ga. 2007)
(dismissing Title VII disability claim "[b]ecause disability

15, 2008.  On July 17, 2008, DaCosta declined the alternative

position the Town offered in lieu of his current position.  At

the Town's request, DaCosta's physician submitted an additional

note dated August 15, 2008, that he could "work ice and snow" as

well as "a reasonable amount of overtime."  (Docket Entry # 35-

8).  DaCosta concedes he was able to work the reasonable amounts

of overtime in 2008 and 2009 and that he had no issues working

overtime after the August 15, 2008 note.  DaCosta testified at

his deposition that the issue was resolved after the August 2008

note.[28]

     As explained by the SJC in Ocean Spray, the limitations

period begins to run when the employer gives an explicit refusal

to accommodate the employee's request for a reasonable

accommodation.  Ocean Spray Cranberries, Inc. v. Massachusetts

Com'n Against Discrimination, 808 N.E.2d at 268 ("an explicit

refusal by an employer to accommodate (or to engage at all in

the interactive process) presents the easy case" in deciding

when limitations period begins to run); see generally Tobin v.

Liberty Mutual Insurance Co., 553 F.3d at 130 (under ADA, a

"denial of a disabled employee's request for accommodation

starts the clock running on the day it occurs").  In the event

"an employer responds to a request for a reasonable

_____

discrimination is not covered by Title VII"); see 42 U.S.C. §
2000e-2(a)(1).
     [28]  See fn. 27.

43

accommodation with equivocal action or inaction, the limitations

period in G.L. c. 151B, § 5, begins to run at the point

thereafter when the employee knew or reasonably should have been

aware that the employer was unlikely to afford him a reasonable

accommodation." <u>Ocean Spray Cranberries, Inc. v. Massachusetts</u>

<u>Com'n Against Discrimination</u>, 808 N.E.2d at 268.  Here, although

the Town engaged in additional interactions with DaCosta and his

physician, those interactions ended in August 2008.  Indeed,

after DaCosta's physician sent the August 15, 2008 note to the

Town, DaCosta considered the issue resolved.[29]  He did not make

any additional request for an accommodation and he considered

the issue resolved after the August 15, 2008 note.  As of August

15, 2008, he therefore knew that the Town was unlikely to afford

---

[29]  The following colloquy took place during DaCosta's
deposition:
>     Q.  In other words, after this [August 15, 2008] note was
>     sent to the town, it resolved the issue; correct?
>     A.  I think it did, yes.
>     Q.  You were able to work overtime–
>     A.  Yes.
>     Q.  –and the schedule that you were given for your job?
>     A.  Yes.
>     Q.  Okay.  So am I correct that you didn't request or need
>     any kind of further accommodation for your diabetes;
>     correct?
>     A.  Yes.
>     Q.  Now from the date of this note, August 15, 2008 up
>     until the present, have you had any issues with working
>     overtime because of the diabetes?
>     A.  No.
>     Q.  You've been fine; is that correct?
>     A.  Yes.
(Docket Entry # 35-2, pp. 101-102).

him a reasonable accommodation.  The 300 day limitations period
therefore ended 300 days later in June 2008, prior to the July
14, 2009 filing of the MCAD charge.[30]  The chapter 151B
disability claim is untimely.

Turning to the ADEA, Title VII national origin and chapter
151B age and national origin discrimination claims, the
anchoring, timely events must have a substantial relationship to
the untimely discriminatory incidents.  See Ocean Spray
Cranberries, Inc. v. Massachusetts Com'n Against Discrimination,
808 N.E.2d at 266; Windross v. Barton Protective Services, Inc.,
586 F.3d at 103; Rivera-Rodriguez v. Frito Lay Snacks Caribbean,
a Div. of Pepsico Puerto Rico, Inc., 265 F.3d at 22; see also
Diaz v. Jiten Hotel Management, Inc., 671 F.3d 78, 85-86 (1st
Cir. 2012) (discussing continuing violation doctrine in chapter
151B age discrimination claim alleging instructional error and
recognizing substantial relationship requirement).  The timely
act or acts must also violate the statute in order to apply the
continuing violation doctrine and recover damages for the
untimely acts.  See Campbell v. BankBoston, N.A., 327 F.3d at
11; Goldman v. Sears, Roebuck & Co., 607 F.2d at 1018; Crocker
v. Townsend Oil Co., Inc., 979 N.E.2d at 1084-1085; see also
Windross v. Barton Protective Services, Inc., 586 F.3d at 103.

---

[30]  Alternatively, the limitations period began to run at
the time the Town denied the accommodation in the July 15, 2008
letter.

Here, the timely acts consist of Balboni's old man comment in March 2010,[31] treating DaCosta in a dissimilar fashion regarding out of grade pay, assigning better jobs to employees with lower seniority than DaCosta and the town resident's complaint about asphalt spilling from DaCosta's truck.

Examining the untimely conduct, no reasonable factfinder could conclude that the incident involving Balboni's old man comment has a substantial relationship to any of the untimely events. None of the untimely events relate to Balboni or concern comments or remarks implicating or inferentially relating to DaCosta's age or national origin or the age or national origin of any other Town employee. See, e.g., Siupa v. Astra Tech, Inc., 2013 WL 4854031, at *9 (D.Mass. Sept. 10, 2013) (rejecting continuing violation doctrine because "previous conduct that Siupa claims constituted sexual harassment involved various other actors (not Johnson), and took place at" different venue).

It is well settled that, "[W]hen ascertaining whether an anchoring act is 'substantially related' to an untimely act, [a court] should ask if the subject matter of the anchoring act is 'sufficiently similar' to that of the untimely act." Lockridge

---

[31]   As explained in footnote 20, DaCosta's discovery that Balboni was making comments about DaCosta working for the Highway Department even though he was not a U.S. citizen is excluded from the record as double hearsay.

v. The University of Maine System, 597 F.3d at 474 n.7.
Collectively, the timely acts lack a substantial relationship to
the refusal to hire DaCosta because he did not have a required
license, the awarding of the Tech 3 to Lopez and DaCosta's July
2008 refusal to transfer to another position.  The timely acts
do not involve sufficiently similar subject matters to the
foregoing incidents because they do not involve applications,
promotions, transfers or refusals by DaCosta regarding a
distinct position.  Buckley's March 2010 conversation with
DaCosta about the resident's complaint is distinct from Arrighi,
a different actor, calling DaCosta into her office to address
the January 2007 joke incident and the July 2008 sleeping
incident.  See Siupa v. Astra Tech, Inc., 2013 WL 4854031, at *9
(previous conduct involved different actors).

A reasonable factfinder however could find that Buckley's
assignments of easier, less labor intensive jobs to DaCosta's
coworkers with less seniority took place before and after
September 17, 2009.  It therefore remains a genuine issue of
material fact as to whether the timely job assignments are
sufficiently similar to the corresponding untimely job
assignment incidents.

Finally, a number of the untimely events amount to discrete
acts.  The refusal to hire DaCosta for the roll off position in
2006 without giving him the opportunity to obtain the required

license amounts to a discrete act that triggers the 300 day time period.  See Tobin v. Liberty Mutual Insurance Co., 553 F.3d at 129 (discrete acts include "refusal to hire").  The decision to decline the garbage truck position is likewise a discrete act. See generally Johnson v. University of Puerto Rico, 714 F.3d at 53.[32]

2.  Adverse Employment Action

The Town next maintains that DaCosta fails to make a prima facie showing that he experienced an adverse employment action based on his age and national origin claims under chapter 151B, the ADEA and Title VII.[33]  The Town also contends that the old age comment by Balboni, a nondecisionmaker, constitutes no more than a stray workplace remark.  (Docket Entry # 34).  DaCosta alleges he was discriminated because of his age and national origin and experienced "a diminishment of his professional reputation" as well as ongoing mental and emotional distress. (Docket Entry # 40).

Chapter 151B renders it unlawful for the Commonwealth or its subdivisions, "because of the age of any individual, to refuse to hire or employ or to bar or discharge from employment

_____

[32]  The untimely acts may be considered as background evidence.  See Malone v. Lockheed Martin Corp., 610 F.3d 16, 22 (1st Cir. 2010).
[33]  Because the chapter 151B disability claim is untimely, it is not necessary to address the Town's alternative arguments for summary judgment on this claim.

48

such individual in compensation or in terms, conditions or privileges of employment." Mass. Gen. L. ch. 151B, § 4, ¶ 1B. The ADEA also makes it unlawful for an employer to "refuse to hire or to discharge any individual or otherwise discriminate against [him] with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The analyses of the ADEA and chapter 151B age discrimination claims "are 'substantially similar' in all relevant respects" for present purposes. Adamson v. Walgreens Co., 2014 WL 1674164, at *8 (1st Cir. April 29, 2014).

"Absent direct evidence of discrimination . . . ADEA claims are evaluated" under the burden shifting framework outlined by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). See Cameron v. Idearc Media Corp., 685 F.3d 44, 48 (1st Cir. 2012); Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447 n.2 (1st Cir. 2009). Given the absence of sufficient direct evidence of age discrimination by the Town, the McDonnell Douglas standard applies. Title VII and chapter 151B national origin claims are also governed by the McDonnell Douglas framework where, as here, there is insufficient evidence of direct evidence of national origin discrimination. See Johnson v. University of Puerto

Rico, 714 F.3d at 53-54 (Title VII national origin claim).
The complaint enumerates a series of incidents in which DaCosta
received treatment different from those of other Town employees
based on DaCosta's age and national origin.  (Docket Entry # 1,
¶ 17) ("[o]nce again, Plaintiff was treated differently than
younger, fellow workers who are citizens of the United States");
(Docket Entry # 1, ¶ 29) ("DaCosta was the only one, again, that
was called in for disciplinary action"); (Docket Entry # 1, ¶
30) ("DaCosta was singled out . . . due to Plaintiff's age");
(Docket Entry # 1, ¶ 34) ("[m]ore discrimination in comparison
to other similarly situated employees"); (Docket Entry # 1, ¶
37) ("just another incident of treating Plaintiff differently
than his fellow employees").  The complaint also asserts that
"being older, he was treated differently."  (Docket Entry # 1, ¶
27).  The complaint therefore sets out disparate treatment
claims based on DaCosta's age and national origin.  See
International Broth. of Teamsters v. U.S., 431 U.S. 324, 335,
n.15 (1977) ("'[d]isparate treatment,'" which "is the most
easily understood type of discrimination," is when "employer
simply treats some people less favorably than others because of
their race, color, religion, sex, or national origin").

To establish a prima facie case of disparate treatment
based on national origin:  "(1) the plaintiff must be a member
of a protected class; (2) she must be qualified for her job; (3)

she must suffer an adverse employment action at the hands of her

employer; and (4) there must be some evidence of a causal

connection between her membership in a protected class and the

adverse employment action, e.g., in the case of a firing, that

the position was filled by someone with similar qualifications."

Bhatti v. Trustees of Boston University, 659 F.3d at 70 (race

discrimination claim based on employer requiring plaintiff to

perform unpaid setup time) (citing St. Mary's Honor Ctr. v.

Hicks, 509 U.S. 502, 506 (1993)); see also Prescott v. Higgins,

538 F.3d 32, 41 (1st Cir. 2008) (third and fourth prongs of prima

facie racial discrimination claim in compensation require

"adverse employment action with respect to compensation" and

that "similarly-situated employees outside the protected class

received more favorable treatment").  A prima facie case of age

discrimination requires the plaintiff to show that "'(1) that he

was at least forty years old when he was fired; (2) that his job

performance met the employer's legitimate expectations; (3) that

he suffered an adverse employment action such as a firing;

and,'" in the case of a firing, "'(4) that the employer filled

the position, thereby showing a continuing need for the services

that he had been rendering.'"  Adamson v. Walgreens Co., 2014 WL

1674164, at *3 (1st Cir. April 29, 2014) (ADEA and chapter 151B

age discrimination claim).

"The fourth element requires the plaintiff to produce
'evidence adequate to create an inference that an employment
decision was based on an illegal discriminatory criterion.'"
Rivera-Aponte v. Restaurant Metropol #3, Inc., 338 F.3d 9, 11
(1st Cir. 2003) (ADEA claim); see also Abdu-Brisson v. Delta Air
Lines, Inc., 239 F.3d 456, 466-467 (2nd Cir. 2001) (third and
fourth prong require showing "an adverse employment action" and
"circumstances surrounding that action give rise to an inference
of age discrimination"). Massachusetts cases frame the
corresponding prong of a prima facie case as requiring the
plaintiff to show that he "suffered an adverse employment action
under circumstances giving rise to an inference of unlawful
discrimination." Lavalley v. Quebecor World Book Services LLC.,
315 F.Supp.2d 136, 144 (D.Mass. 2004) (collecting Massachusetts
cases).

The Town submits there is no evidence that DaCosta suffered
an "adverse employment action" with respect to the age and
national origin and age discrimination claims. (Docket Entry #
34 & 44). As indicated above, although "the prima facie case
varies according to the nature of the plaintiff's claim, . . .
it requires, among other things, a showing of an adverse
employment action." Alvarado-Santos v. Dep't of Health of the
Commonwealth of Puerto Rico, 619 F.3d 126, 132 (1st Cir. 2010)
(Title VII gender and national origin discrimination claims);

Bennett v. Saint-Gobain Corp., 507 F.3d at 30 (ADEA prohibits employer "from taking an adverse employment action against an employee who is forty years of age or older because of the latter's age"). In order to demonstrate an "adverse employment action," the plaintiff "must show 'that a reasonable employee would have found a challenged action materially adverse.'" Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 36 (1st Cir. 2011); Billings v. Town of Grafton, 515 F.3d 39, 52 (1st Cir. 2008). An adverse employment action is gauged under "an objective standard." Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010); see Billings v. Town of Grafton, 515 F.3d at 53 (inquiry is whether "actions could have been materially adverse to a reasonable employee").

Materially adverse employment actions typically involve "discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Cham v. Station Operators, Inc., 685 F.3d 89, 94 (1st Cir. 2012). In contrast, a superior's "extreme supervision" and snubbing of an employee or increased criticism does not rise to the level of an adverse employment action. Billings v. Town of Grafton, 515 F.3d at 54 (citing Marrero v. Goya of P.R., Inc., 304 F.3d at 23, and Hernandez-Torres v. Intercont. Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)); see

Bhatti v. Trustees of Boston University, 659 F.3d at 73.
Similarly, a loss of shifts during holiday weeks is also not "an
adverse employment action in the context of a workplace where
schedules fluctuate and no employee is entitled to any given
shift." Cham v. Station Operators, Inc., 685 F.3d at 95.

As to reassignments of job duties, they are "'not
automatically actionable.'" Billings v. Town of Grafton, 515
F.3d at 54. Instead, it depends upon all of the circumstances
viewed from "the perspective of a reasonable person in the
plaintiff's position." Id. (internal quotation marks omitted).
For example, transferring an employee to a new position
involving "far less skill and significantly harsher working
conditions" or less prestige and less experience along with
excluding the employee from board meetings might constitute a
materially adverse employment action. See Rodriguez-Vives v.
Puerto Rico Firefighters Corps of Puerto Rico, 743 F.3d 278,
285-286 (1st Cir. 2014) (citing Tart v. Illinois Power Co., 366
F.3d 461, 473 (7th Cir. 2004)); Billings v. Town of Grafton, 515
F.3d at 54. Ordinarily, reprimands by management or supervisors
do not constitute materially adverse employments actions if they
do not carry with them "any tangible consequences." Bhatti v.
Trustees of Boston University, 659 F.3d at 73. Workplaces are
"rarely idyllic retreats, and the mere fact that an employee is
displeased by an employer's act or omission does not elevate

that act or omission to the level of a materially adverse employment action." Morales-Vallellanes v. Potter, 605 F.3d at 35.

Viewing the remaining timely events and the job assignment incidents individually as well as collectively, Buckley's March 2010 conversation with DaCosta about the resident's complaint did not carry with it any tangible consequences. Pre-disciplinary meetings with supervisors that lack any tangible consequences carry no adverse employment action. See Gomez-Perez v. Potter, 2011 WL 6445569, at *5 (1st Cir. Dec. 22, 2011) ("pre-disciplinary personnel actions" consisting of a meeting with the employee to address the alleged misconduct "did not rise to the level of material adversity").[34] DaCosta never received a reprimand or discipline in connection with the incident. See Bhatti v. Trustees of Boston University, 659 F.3d at 73 (a "criticism that carries with it no consequences is not materially adverse and therefore not actionable"). Consequently, the incident provides no support for the presence of an adverse employment action. See Bhatti v. Trustees of Boston University, 659 F.3d at 73 (reprimand not materially adverse due to lack of tangible consequences and it was "directed at correcting workplace behavior that management

_____

[34] Rule 32.1, Fed. R. App. Pro., allows citations of unpublished opinions issued on or after January 1, 2007. See also First Circuit Rule 32.1.0.

perceived as needing correction"); <u>Gomez-Perez v. Potter</u>, 2011
WL 6445569, at *5.

Balboni's old man comment fails to provide any support for
the presence of an adverse employment action. The comment, made
in the context of an argument, had no effect or tangible
consequence on DaCosta's job duties, schedule, salary or
anything else connected to his employment. The summary judgment
record also fails to support DaCosta's legal argument or
conclusory allegation that the discrimination "caused [him] to
suffer a diminishment of his professional reputation." (Docket
Entry # 1, ¶¶ 44, 48, 54, 59).

In contrast, the denials of out of grade pay for asphalt
work that DaCosta did not grieve implicate a reduction of
compensation. Although the decrease in compensation is not
significant in amount, it nevertheless provides support for the
presence of a materially adverse employment action. <u>See</u> <u>Sensing
v. Outback Steakhouse of Florida, LLC</u>, 575 F.3d 145, 160 (1st
Cir. 2009) ("adverse employment actions" under chapter 151B "may
include disadvantaging her in respect to salary, grade, or other
objective terms and conditions of employment") (internal
brackets and quotation marks omitted). A jury could also view
that Buckley's repeated assignments of more difficult and labor
intensive work to DaCosta than to other members of his crew made
the position far more onerous for DaCosta. <u>See</u> <u>Rodriguez-Vives</u>

<u>v. Puerto Rico Firefighters Corps of Puerto Rico</u>, 743 F.3d at
285-286 (citing <u>Tart v. Illinois Power Co.</u>, 366 F.3d at 473,
wherein court found transfer to new position "involved far less
skill and significantly harsher working conditions"); <u>Billings</u>
<u>v. Town of Grafton</u>, 515 F.3d at 54.  These circumstances
occurred less than 300 days before the July 14, 2010 filing of
the charge.[35]  Viewing all of the foregoing incidents
collectively, only the decrease in compensation for out of grade
pay and the harsher working conditions for DaCosta than for
other members of his crew survive summary judgment based on the
Town's adverse employment action.

The Town next argues that Balboni's old man comment is
insufficient to support the ADEA and the chapter 151B age
discrimination claims.  The Town reasons that Balboni is not a
decisionmaker and the aberrant comment amounts to no more than a
stray workplace remark.

"Stray workplace remarks . . . normally are insufficient,
standing alone, to establish either pretext or the requisite
discriminatory animus."  <u>Melendez v. Autogermana, Inc.</u>, 622 F.3d
46, 54 (1st Cir. 2010); <u>Cham v. Station Operators, Inc.</u>, 685 F.3d
at 96 (stray workplace remarks are normally "'insufficient,
standing alone, to establish either pretext or the requisite

---

[35]  The job assignments also took place prior to September
17, 2009.

discriminatory animus'"). A stray workplace "remark is a statement that, while on its face appears to suggest bias, is not temporally or causally connected to the challenged employment decision and thus not probative of discriminatory animus." Barry v. Moran, 661 F.3d at 707.

Balboni's old man comment falls squarely within the framework of a stray workplace remark.[36] During an argument, Balboni, a coworker, called DaCosta an "'old man.'" (Docket Entry # 35, ¶¶ 54, 62) (Docket Entry # 53, ¶¶ 54, 62). The record includes no other age based comments on the part of Balboni or any other town employee. Accordingly, Balboni's stray workplace comment cannot serve as a basis to show either pretext or a discriminatory animus.[37] See, e.g., Cham v. Station Operations, Inc., 685 F.3d at 96; Douglas v. J.C. Penney Co., 474 F.3d 10, 15 (1st Cir. 2007).

3. Adverse Employment Action Based on Age and National Origin

As a final argument, the Town maintains that the adverse employment action, if any, was not based on DaCosta's age or national origin. The Town therefore submits that DaCosta fails to make the prima facie showing. (Docket Entry # 34) ("This

---

[36] It is therefore not necessary to address the Town's argument that Balboni is not a final decisionmaker.
[37] As previously noted, the comment also provides no support for the existence of an adverse employment action.

case begins and ends with the first stage of the McDonnell Douglas framework."). Except with respect to the hostile work environment claims, the only remaining age and national origin claims concern the out of grade pay and the assignments of more labor intensive work to DaCosta than to other, less senior and younger members of his crew.

As previously explained, the fourth element of a prima facie case varies depending upon the nature of the discrimination claim. Outside the context of a termination claim, case law frames the element in slightly different language. See Bhatti v. Trustees of Boston University, 659 F.3d at 70 (fourth element requires showing "a causal connection between her membership in a protected class and the adverse employment action . . ..."); Rivera-Aponte v. Restaurant Metropol #3, Inc., 338 F.3d at 11 (fourth element requires "'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion'"); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d at 466-467 (third and fourth prong require showing "an adverse employment action" and "circumstances surrounding that action give rise to an inference of age discrimination"); Lavalley v. Quebecor World Book Services LLC., 315 F.Supp.2d at 144 (chapter 151B requires that plaintiff suffer "adverse employment action under circumstances giving rise to an inference of unlawful discrimination" such as

not meting out the adverse employment actions in neutral way);

see also Prescott v. Higgins, 538 F.3d at 41 (fourth prong in

Title VII compensation claim based on race requires employee to

show "similarly-situated employees outside the protected class

received more favorable treatment").  Overall, "there must be at

least a logical connection between each element of the prima

facie case and the illegal discrimination for which it

establishes" a presumption.  O'Connor v. Consolidated Coin

Caterers Corp., 517 U.S. 308, 311-312 (1996).

With respect to the ADEA and chapter 151B age

discrimination claims based on job assignments, DaCosta

testified that he was "the oldest guy doing the hardest work" on

the asphalt crew.  (Docket Entry # 35-2, pp. 123-127).  Buckley

"always" assigned workers with less seniority to easier jobs

such as hauling asphalt "to the grader."  (Docket Entry # 35-2,

pp. 124-126).  Hauling asphalt to the grader simply entailed

driving a DPW truck to the location, dumping the load of asphalt

at which point "the grader grades the roads."  (Docket Entry #

35-2, p. 125).  Because DaCosta was one of the oldest members of

the crew, a reasonable factfinder could conclude that Buckley

therefore assigned employees younger than DaCosta to the more

desirable jobs.  (Docket Entry # 35-2, pp. 123-127).  Such

evidence sufficiently satisfies the fourth prong of the prima

facie showing of the ADEA and the chapter 151B age discrimination claims.

In contrast and with respect to the national origin claims, the only "evidence" DaCosta proffers to attribute Buckley's job assignments on the asphalt crew to national origin consists of DaCosta learning that Balboni was making comments about him working for the DPW when he was not a U.S. citizen. When asked at his deposition whether the job assignments had anything to do with DaCosta's national origin, DaCosta could only identify that he "heard through the grapevine" as well as from "different guys" that Balboni was asking, "'Why should we have Gerry DaCosta working for us? He ain't even an American citizen.'" (Docket Entry # 35-1, pp. 127-129). As previously explained, the Town correctly maintains that this testimony is hearsay and, in fact, double hearsay. See Bennett v. Saint-Gobain Corp., 507 F.3d at 28-29; Dávila v. Corporación De Puerto Rico Para La Difusión Pública, 498 F.3d at 17. The record does not include any evidence regarding the national origin of other members of the crew. The record is devoid of any causal connection between DaCosta's membership in the protected class, i.e., his national origin as Bermudian, and the adverse employment action of receiving harsher and more labor intensive job assignments. DaCosta, who bears the burden of proof at trial, does not point to other evidentiary facts to avoid summary judgment. Employing

any of the foregoing frameworks for the fourth element, there
are no facts sufficient to give rise to an inference of national
origin discrimination based on Buckley's conduct in meting out
job assignments.

Turning to the out of grade pay adverse employment actions
with respect to the age and national origin discrimination
claims, there is little evidence to connect or reasonably infer
a connection between DaCosta's failure to receive out of grade
pay in the fall of 2009 and his age or national origin.  DaCosta
admits that he is not sure of the dates that he did not receive
out of grade pay and he has no documentation to support the
occasions when he failed to receive such pay.  He did not grieve
these incidents.  On the other hand, Finely, a foreman, and
Healey received out of grade pay for hauling snow out of town in
the winter whereas Buckley, the decision maker, denied out of
grade pay to DaCosta on a few occasions in the fall of 2009
(Docket Entry # 35-2, pp. 137, 183) or had to speak to Castro to
approve out of grade pay for DaCosta.  Although the issue is
close, given the low threshold to adequately show a prima facie
case these circumstances provide a basis to satisfy the fourth
element of the prima facie showing for Title VII national origin
and ADEA claims and the corresponding element of the prima facie
showing for chapter 151B age and national origin claims under
Prescott v. Higgins, 538 F.3d at 41, and Lavalley v. Quebecor

<u>World Book Services LLC.</u>, 315 F.Supp.2d at 144.

<div align="center">CONCLUSION</div>

In accordance with the foregoing discussion, the Town's motion for summary judgment (Docket Entry # 33) is **ALLOWED** as to Count I and **ALLOWED** in part and **DENIED** in part as to Count IV. Except for the hostile work environment claims, the ADEA and chapter 151B age discrimination claims with respect to job assignments, and the ADEA, Title VII and chapter 151B age and national origin discrimination claims with respect to the limited out of grade pay incidents in the fall of 2009, Count IV is **DISMISSED**. Counts II, III and V are **DISMISSED** in light of DaCosta's decision stipulating to the dismissal of these claims. The motion to strike (Docket Entry # 45) is **ALLOWED** in part and **DENIED** in part. The deadline to file dispositive motions has passed and there shall be no extensions in this 2011 case. The parties will therefore appear for a status conference on July 23, 2014, at 3:00 p.m. to set a trial date.

<div style="margin-left: 40%;">
/s/ Marianne B. Bowler<br>
**MARIANNE B. BOWLER**<br>
United States Magistrate Judge
</div>